# IN THE COURT OF APPEALS OF IOWA

No. 22-0227
Filed December 21, 2022

**CORY ELDRIDGE and SHANNON ELDRIDGE,**
    Plaintiffs-Appellants,

**vs.**

**NICHOLAS TURNER and KIMBERLY TURNER,**
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Marshall County, John J. Haney,

Judge.

Cory and Shannon Eldridge appeal from the district court's ruling in this

boundary dispute with adjoining property owners Nicholas and Kimberly Turner.

**AFFIRMED.**

Brandon J. Buck of Moore, McKibben, Goodman & Lorenz, LLP,

Marshalltown, for appellants.

Jennifer L. Zahradnik of Kollmorgen, Schlue & Zahradnik, P.C., Belle

Plaine, for appellees.

Considered by Bower, C.J., Tabor, J., and Vogel, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**BOWER, Chief Judge.**

Cory and Shannon Eldridge appeal from the district court's ruling in this boundary dispute with adjoining property owners Nicholas and Kimberly Turner. The Eldridges claim the disputed area belongs to them under theories of boundary by acquiescence or adverse possession. The district court found they failed to prove either theory and quieted title to the Turners.

*Scope of Review.* This case was tried in equity, and our review is therefore de novo. Iowa R. App. P. 6.907.

*Background Facts.* The following facts are supported by the exhibits and testimony. The property in dispute is rural, wooded land to the south of a meandering creek; the area is hilly and sometimes quite steep.

 

The Eldridges claim the fence pictured above running through the tree line was recognized for decades by their predecessors in title, the Bucks,[1] as the southern boundary of their property. And they claim the predecessors in title to the Turners' property, the Frelands, considered the fence the northern boundary of their abutting rural property.

The rural land passed down through the Buck family members for decades until the Eldridges purchased the property in 2008. The Eldridges surveyed a five-acre portion in 2010 and built their home on the lot in 2013. As the Bucks had done, the Eldridges used much of the property for pasture land for cattle from 2008 to 2016. A 2020 assessor's aerial photo of the Eldridges' property is included below. We are told the fence lies south of a creek in the tree line.



---

[1] The Eldridges' predecessors in title were Thomas, Gary, Daniel, Bruce, and Ronald Buck, who obtained title from the Estate of Philip Buck on January 29, 1999.

The Frelands used the abutting property for pasture and cropland and passed it down to family members for decades until the Turners purchased the property in 2018. In anticipation of building their home, the Turners commissioned a 2020 Plat of Survey Retracement for their property, shown below:



This dispute arose in 2021 when the Turners cleared land on the northern-most portion of their property to prepare for their build and, in doing so, dug up fencing within Lot Two of the Northwest Fractional Quarter of the Northeast Quarter of Section Five, which is included in the Turners' legal description of their property. In the plat above, the pertinent Lot Two is located above the "NORTH

LINE S/W 1/4 NE FR 1/4." The figure below—a portion of a 1995 plat of survey—highlights Lot Two[2] and indicates a fence running through the lot: [3]



The upper Lot One in this figure is the southern portion of Eldridges' property as contained in their legal description.

On April 13, 2021, the Eldridges sued the Turners under alternative theories for that portion of Lot Two lying north of the fence shaded in yellow. They first claim title should be quieted in them as a boundary by acquiescence. Their petition states:

> 4. The [Eldridges'] Property and the [Turners'] Property is divided by a fence which is believed to have been erected more than fifty years ago.
> . . . .
> 7. The [Eldridges], [Turners], and their predecessors in interest have acquiesced in the fence as the boundary and believed it to be the true boundary for more than ten years.
> 8. Iowa Code [section] 650.14 [(2021)] provides that if a boundary is recognized and acquiesced in for ten years, such boundary shall become the permanent boundary.

---

[2] This is a portion of an exhibit admitted at trial.
[3] The Eldridges' Lot One is 41.36 acres. The Turners' property, according to the 2020 retracement survey, is 12.59 acres of which Lot Two is a two-acre parcel.

*Legal principles.* "A party seeking to establish a boundary other than the legal description as disclosed by a survey has the burden of proving it by clear evidence." *Ivener v. Cowan*, 175 N.W.2d 121, 122 (Iowa 1970).

Our supreme court has described the doctrine of boundary by acquiescence as follows:

> It is the mutual recognition by two adjoining landowners for ten years or more that a line, definitely marked by fence or in some manner, is the dividing line between them. Acquiescence exists when both parties acknowledge and treat the line as the boundary. When the acquiescence persists for ten years the line becomes the true boundary even though a survey may show otherwise and even though neither party intended to claim more than called for by his deed.

*Ollinger v. Bennett*, 562 N.W.2d 167, 170 (Iowa 1997) (quoting *Sille v. Shaffer*, 297 N.W.2d 379, 381 (Iowa 1980)). "Each of the adjoining landowners or their grantors must have [had] knowledge of and consented to the asserted property line as the boundary line." *Tewes v. Pine Lane Farms, Inc.*, 522 N.W.2d 801, 806 (Iowa 1994). "Acquiescence in the existence of a fence as a barrier, not as a boundary, is not such recognition as will establish it as the true line." *Brown v. McDaniel*, 156 N.W.2d 349, 352 (Iowa 1968).

The district court found:

> [T]he Eldridges failed to prove boundary by acquiescence. Although Mr. [Gary] Buck and Mr. [Richard] Freland testified that their respective families treated the fence line as the boundary line for decades, that line was never judicially established as the boundary. Moreover, both Mr. Buck and Mr. [sic] Freland[4] sold their parcels to the Eldridges and Turners, respectively, based upon the true boundary lines of the surveys performed. The court notes that neither the Eldridges nor the Turners were told that the Bucks and Frelands actually considered the fence line to be the boundary line.

---

[4] Christina Freland obtained the Freland property via a divorce settlement, and she was the party who sold the parcel to the Turners.

Therefore, as the boundary had not yet been established pursuant to [section] 650.14, the court finds that Mr. Buck and Christina Freland conveyed the properties based on the true boundaries of the surveys.

Furthermore, the court is convinced by the testimony offered by Mr. Harris [who performed the 2020 retracement survey], Mr. Turner, and Mr. Eldridge, that this was not maintained as a boundary fence but was a "fence of convenience" or a barrier fence to keep cattle confined. Among important indicators, the fence itself was in a state of disrepair. This disrepair was significant enough that Mr. Harris thought the prior depiction of the fence on the survey was an "egregious error." It also appears to this court that the Bucks likely put the fence on the first level ground they could find to the south of the timber, to avoid going down in the steep hills in that area. Running cattle through this area was discontinued by the Eldridges approximately [five] or [six] years ago. Moreover, the Eldridges asked permission of the Frelands to use the gate in the fence to drive their [all-terrain vehicles (ATVs)] through. The Eldridges' trails seem to run roughly parallel to the survey line while remaining largely on their side of the boundary.

Finally, the court notes that the Eldridges failed to bring an action to quiet title in them and proposing a new boundary line. While the Eldridges and their predecessors may have pastured cattle on the area in dispute for a time, there . . . was no credible evidence offered at trial to indicate the Eldridges have engaged in maintenance or worked to improve the disputed property or fence line. Therefore, the court finds that the Eldridges failed to establish boundary by acquiescence by clear evidence.

The Eldridges contend the district court erred in requiring a "judicially established" boundary as an element of a boundary by acquiescence. They maintain "judgment should be entered in favor of the [Eldridges] establishing the fence as shown in the 1995 plat of survey was the true boundary."

Because our review is de novo, we "examin[e] both the facts and law and adjudicat[e] anew those issues properly preserved and presented." *In re A.R.*, 932 N.W.2d 588, 589 n.1 (Iowa Ct. App. 2019). We are not bound by the district court's factual findings, but we give them weight—especially those involving witness credibility. *Id.*

Our first problem with the Eldridges' request that we "establish the fence as shown in the 1995 plat of survey was the true boundary" is the lack of useful information about the location or length of the fence across Lot Two. Our courts have recognized that the proposed boundary line "must be known, definite, and certain, or known and capable of ascertainment. The line must have certain physical properties such as visibility, permanence, stability, and definite location." *Heer v. Thola*, 613 N.W.2d 658, 662 (Iowa 2000) (quoting 12 Am. Jur. 2d *Boundaries* § 86 (1997)). The plat provided is not sufficient to meet these requirements.

Moreover, the evidence presented by the Eldridges does not show a fence line that is visible, permanent, stable, and in a definite location. The Eldridges immediate predecessor in title, Gary Buck, testified he was only "vaguely" familiar with the location of the fence line. When questioned by the Eldridges' attorney, Gary stated:

> I mean, that was across the creek. But fortunately we didn't have to maintain that very often. But yeah. That was—that was our south pasture fence.
>         Q. But did—To your knowledge did your father [Phil] and/or uncle [John] have to repair that fence, go over and check it, do maintenance work on it? A. Well, we would check it but yeah. I don't know what the arrangement was in the 1850s or '60s, but—why it was built where it was. . . .
>         . . . I talked to John about the fence line, and he stated to me that they—he never—or Phil had never changed that.
>         . . . And, you know, several times—I only recall about two times in my [thirty] years of having to care for that fence of just, you know, going over there and cutting the tree off, the limbs.
>         And the most we've ever done was having to tack, you know, replace staples that have been pulled or—or a bull or something has broken the wire, you know. That sort of thing.

The Eldridges' claim of boundary by acquiescence is premised on their predecessor's knowledge and conduct. Gary Buck was familiar with the property because his father and uncle had pastured cattle on it. Gary obtained ownership in 1999. He testified the land south of the creek was "[m]ainly a fairly steep hill with timber growing." Gary's vague notion of a fence somewhere south of the creek visited twice in thirty years can hardly qualify as knowledge of a known definite boundary in a definite location.

Moreover, Gary testified he never had any conversations with the Frelands that the fence was the boundary between properties. We agree with the trial court that the fence was not maintained as a boundary but "was a 'fence of convenience' or a barrier fence to keep cattle confined." We again note Gary Buck's testimony:

> Q. Okay. Now, as early as you can remember who owned the land south of that property? A. Frelands. I'm not exactly sure—I think Jamie Freland did.
> Q. Okay. A. And we got along great with them for years. I mean, well, we—we still do—or the ones that are left. Jamie and Bill, they had cows and milk cows and stuff. And so everybody knew good fences make good neighbors and, you know, maintained it as such.
> Q. Now, did they pasture cattle south of that property? A. I think they did. And there's a crop field there. I'm not sure how much they ran them in the timber—that timber part.

Like their predecessors, the Eldridges pastured cows on their property from 2009 until 2016. Maintenance of the southern fence by the Eldridges involved ensuring an electric fence was live to keep their cows on their land. Shannon Eldridge testified that when they bought their property, the fence was "rough or poor condition and, you know, you needed that extra electric wire to make sure things stayed in." In an earlier ruling denying the Eldridges temporary injunctive relief, the court noted:

Mr. Eldridge testified he rarely uses the land south of the creek as it is all timber. The fence south of the timber area has been in significant disrepair and he has not had any cows graze or repairs made to the fence area in at least two years or more. Mr. Eldridge further testified he typically keeps his cattle north of the creek and put a temporary fence in the creek bottom to prevent his cattle from traveling into the timber area.

We acknowledge acquiescence "may be inferred by the silence or inaction of one party who knows of the boundary line claimed by the other and fails to take steps to dispute it for a ten-year period." *Tewes*, 522 N.W.2d at 806. But the Eldridges have not provided clear evidence that the Frelands and the Turners knew the fence was the boundary claimed by the Bucks and the Eldridges and failed to take steps to dispute it. We conclude their claim of a boundary by acquiescence fails.

*Adverse possession.* In the alternative, the Eldridges asserted a claim of adverse possession to the disputed area. "A party claiming title by adverse possession must establish hostile, actual, open, exclusive[,] and continuous possession, under claim of right or color of title for at least ten years." *C.H. Moore Tr. v. City of Storm Lake*, 423 N.W.2d 13, 15 (Iowa 1988). "Proof of these elements must be 'clear and positive.'" *Id.* (citation omitted). "Since the law presumes possession is under a regular title, the doctrine of adverse possession is strictly construed." *Id.*

The Eldridges' petition alleges:

10. The [Eldridges] and their predecessors in interest have been in possession of the area between the surveyed northern line of the [Turners'] Property ("Disputed Property") and the previously existing fence for more than ten years.
11. The possession by the [Eldridges] and their predecessors in interest of the Disputed Property has been hostile, actual, open, exclusive and continuous under a claim of right.

"A claim of right is evidenced by taking and maintaining property, such as an owner of that type of property would, to the exclusion of the true owner; in other words, the plaintiff's conduct must clearly indicate ownership." *Louisa Cnty. Conservation Bd. v. Malone*, 778 N.W.2d 204, 207 (Iowa Ct. App. 2009). "Acts of ownership include occupying, maintaining, and improving land. It also may be evidenced by giving a deed in transferring the property or paying real estate taxes." *Id.* (internal citation omitted). "'[M]ere use' is insufficient to establish hostility or claim of right," but "certain acts, including substantial maintenance and improvement of the land, can support a claim of ownership and hostility to the true owner." *Id.* at 208.

The Eldridges' testimony did not assert they or the Bucks occupied or paid real estate taxes on the disputed land. The Eldridges testified they cleared trails for ATVs; but we have no clear evidence of the location of those trails or if they are in the disputed area. The testimony and exhibits entered establish the trails were in the southwestern portion of the Eldridges' property and that they gained access to the trails via a gate on the actual boundary line through what was then Freland's property—after asking his permission to do so.

What we do have is the exhibit reproduced below, which was a 2014 aerial photograph on which each of the Eldridges drew where they believed the trails were. Shannon used blue ink, Cory used red ink, the black ink outlines a field on the what was then Freland's property. Shannon stated the trail along the southern part "went along the fence a little bit. And circles back." Cory stated, "It's the best I can do though the trees . . . ."



Concerning the location of the ATV trails, Nicholas Turner testified they were in "the relatively flat area." He stated:

> There's no way for you to drive any ATV, UTVs in the—the south[ea]stern portion or even the central portion just because of how thick that vegetation is and how—how aggressive the terrain falls off down to the creek. It would be very, very difficult for anybody to ride back in there.

With respect to maintenance, any maintenance was limited to the fence—specific location unknown—and was minimal. The Eldridges assert we should consider that they pastured cattle in the woods. They testified very generally that they went into the woods occasionally to ride ATVs, hike, mushroom hunt, and shed hunt.[5] But the disputed area in Lot Two is overgrown steep timber with considerable underbrush; they could not ride ATVs there. We are not persuaded occasional hiking and mushroom and shed hunting—even if conducted in the disputed area—is sufficient use to establish hostility or claim of right. We conclude their claim of adverse possession fails. We affirm.

**AFFIRMED.**

---

[5] Shed hunting was never explained but likely refers to looking for antlers shed by deer.